98 So.2d 284 (1957)
Lorenza ST. JULIAN, Plaintiff-Appellee,
v.
STATE of Louisiana (through Department of Institutions), Defendant-Appellant.
No. 4499.
Court of Appeal of Louisiana, First Circuit.
November 19, 1957.
*285 Jack P. F. Gremillion, Atty. Gen., Wm. C. Bradley, Asst. Atty. Gen., for appellant.
H. Alva Brumfield, Arthur J. Cobb, Jr., Baton Rouge, for appellee.
TATE, Judge.
In a previous appearance of this case before this Court, we reversed an earlier judgment sustaining an exception of no cause of action, 82 So.2d 85. We summarized the cause of action as follows, 82 So.2d 88:
"The suit is for wrongful death caused petitioner's son when he was an inmate at the penitentiary when allegedly the prison officials `having full knowledge' that another inmate `was a paranoic or mentally deranged person' did nevertheless place this dangerous inmate in the cell with decedent, and when allegedly said officials further had failed to maintain proper inspection control and safety measures to prevent the paranoic inmate from having a knife and from slashing petitioner's son to death. We feel the petition adequately states a cause of action based upon negligent acts or omissions of State employees. See Honeycutt v. Bass, La.App., 187 So. 848."
After trial on the merits, the District Court awarded the sum of Fifteen Thousand Dollars to the plaintiff, who was the mother of decedent, a 29-year old former merchant seaman who at the time of his being slain by another prisoner on February 2, 1952, had served three and a half years of a 15-year sentence at the State Penitentiary at Angola for armed robbery.
Able counsel for the State in his brief aptly summarizes the jurisprudence concerning the grounds of liability, as follows:
"The general rule gathered from the cases is that in order to hold the State or the employees of a state who have charge of a prison liable for injury to one inmate inflicted by another inmate, there must be knowledge on the part of such officers in charge that such injuries will be inflicted, or good reason to anticipate such, and following that, there must be a showing of negligence on the part of these officials in failing to prevent the injury. Stephens v. Conley, 48 Mont. 352, 138 P. 189; Kusah v. McCorkle [100 Wash. 318], 170 P. 1023 [L.R.A. 1918C, 1158]; Ratliff v. Stanley, 224 Ky. 819, 7 S.W.2d 230 [61 A.L.R. 566]; Riggs v. German, 81 Wash. 128, 142 P. 479; Gunther v. Johnson [36 App.Div. 437], 55 N.Y. S. 869."
See: Honeycutt v. Bass, La.App. 2 Cir., 187 So. 848; 41 Am.Jur. "Prisons and Prisoners," Section 13 at p. 894; 72 C.J.S. Prisons § 13, at p. 866.
The decedent prisoner died almost immediately following a repeated and frenzied stabbing by another prisoner, Dan Gibbs.
A State hospital report, the admissibility of which is contested by the State, shows that Gibbs suffered from a form of insanity known as dementia praecox of the catatonic type, a condition marked by self-absorption and moodiness passing into mania or periodic outbreaks of nervous excitement and violent tendencies. Under our view of the case, however, it is unnecessary to consider whether (as contended by the plaintiff) the State was negligent in failing to examine *286 Gibbs at the time of his commitment for a violent crime committed in one of these violent periods and to discover his insanity and proneness to violence.
For the preponderance of the evidence supports the trial court's determination that the prison officials had actual knowledge of Gibbs' dangerous state for at least two weeks before the stabbing but nevertheless failed to take any steps to confine him or to disarm him of the death-knife. We think the District Court correctly concluded that such conduct in failing to secure other prisoners from reasonably foreseeable harm was negligence which was a proximate cause of the decedent's wrongful death. (In extenuation of the officials involved, the evidence shows that the prison was undermanned and overpopulated.)
The facts found by the trial court show:
Gibbs had commenced to exhibit dangerous tendencies, such as acting strangely and cocking his shotgun (Gibbs was an inmate guard) and threatening other prisoners, as a result of which he had been "taken off the gun" by prison officials at least two weeks before the fatal incident. During his subsequent confinement to the barracks cell "under observation" (by the other inmates occupying the cell), he had mostly sat or lain on his bed, withdrawn and mumbling "the unknown tongue", "bugging his eyes", as the other prisoners testified. The other inmates occupying the cell complained to the prison ward captain before 10:00 a. m. on the very morning of the killing that they were afraid to continue sleeping in the same barracks cell as Gibbs. Between three and four o'clock that afternoon a detail of two unarmed convicts was sent to persuade Gibbs to come to the hospital for mental observation. While they were talking with him Gibbs seized a knife with a 9-inch blade from under his pillow. Jumping past the two-man delegation, Gibbs attacked the decedent, who fell backwards over a box, whereupon Gibbs straddled him and slashed repeatedly with his knife, causing the decedent's almost immediate death.
The chief factual defense of the State is its attempted reliance upon the testimony of Thoyal Benjamin, one of the inmates, to the effect that the decedent was the aggressor in the incident which caused his death. We do not think the District Court erred in discounting this version, unsupported by the preponderance of the other testimony.
The State further argues that any negligence of the penitentiary in failing earlier to confine Gibbs so that he could not harm his fellow prisoners was not a proximate cause of this wrongful death which occurred while the State was in the process of finally fulfilling this duty. That is, the same danger may have existed, it is argued, even if the State had attempted to remove Gibbs from contact with the other prisoners immediately upon learning of his dangerous state.
We feel that this argument overlooks the causal connection with decedent's death of the negligent failure, in connection with learning of Gibbs' dangerous condition, to search and disarm him of the death knife; the evidence indicating that it was common knowledge that many of the inmates kept such homemade weapons. In the picturesque phrases of the District Court, "on the afternoon in question death lurked under the pillow on Gibbs' bunk, and only awaited something, almost anything, to trigger it and point out its victim."
Plaintiff-appellee has answered the appeal seeking an increase of the award to her of Fifteen Thousand Dollars for the loss of her son's love and affection and for her own mental anguish suffered through his wrongful death.
The petitioner had not heard from her son for six months before his conviction and sentencing to Angola, and we agree with the District Court that the evidence does not reflect any actual dependency by her upon her son and only the barest potential possibility of future monetary contributions *287 to her by him, which minimal item can be comprehended within the award for her own mental pain and anguish and the loss of her son's affection.
We are fully cognizant that the award of damages for such items is of necessity somewhat arbitrary and the discretion of the trier of fact should not be disturbed. We are further aware that the life of a felon may be as dear to his mother as that of a saint.
There is, however, a principle that the award of damages in cases involving similar losses should have some degree of uniformity, but taking into account the great variation in the individual circumstances, see e. g., Crowther v. Fenstermaker, La.App. 1 Cir., 96 So.2d 91, and a majority of this Court has determined this principle to be applicable to the present case and that the award of damages for the plaintiff's mental pain and anguish, and loss of her son's affection should, under the particular circumstances of this case, be reduced to Seven Thousand Five Hundred Dollars. See Duree v. State, La.App. 1 Cir., 96 So.2d 854, cases cited at page 863, Syllabus 19.
The cases cited to us by plaintiff-appellee involving higher awards for wrongful deaths are generally distinguishable as involving an actual loss of support, unlike the present which also does not seem to involve a close-knit family relationship.
The State urges again an exception of no right of action filed at the close of the trial, contending that the evidence shows that decedent was survived by a wife, and that under Article 2315, LSA-C.C., the mother of a decedent has a right of action for his wrongful death only in default of surviving widow or children.
The evidence upon which this exception is based consists of certain informal notations in decedent's prison forms and family questionnaire that decedent was "married". The initial prison questionnaire completed from information supplied by decedent showed his "wife" to be "Sheila Washington, 342 Manhattan Ave., New York City, N. Y.", and showed him to have been "married to Sheila Francis 1939 New York City."
Plaintiff, decedent's mother, testified positively that the decedent had never been legally married, and two family friends testified that they had no knowledge of any such marriage. We agree with the trial court that the unsworn and informal notations fall far short of the proof of decedent's marriage required to prove same, especially in view of the contrary testimony of the decedent's mother and family friends. For instance, in a suit by "Sheila Washington" as an alleged surviving spouse, if the existence of the marriage were contested, it is doubtful that such notations by themselves could prove that a legal marriage had taken place. If the State is really serious in this contention, it appears to us that rather than relying upon these inconclusive notations, other proof should have been offered that decedent was legally married and was survived by a legal spouse, such as a marriage certificate and/or other competent evidence.
For the above and foregoing reasons, the judgment below is amended by reducing the award to plaintiff from Fifteen Thousand Dollars to Seven Thousand Five Hundred and no/100 ($7500.00) Dollars, plus legal interest and court costs as provided; and as thus amended, is affirmed.
Amended; and, as amended, affirmed.