**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

MARCH 5, 2026

~~Steph~~, C. J.
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MARCH 5, 2026

SARAH R. PENDLETON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| BARBARA ANDERSON, individually, and BARBARA ANDERSON and PAIGE BATTON, as co-personal representatives of the Estate of Derek Batton, the ESTATE OF RODNEY BATTON, and PAIGE BATTON, as administrator of the ESTATE OF RODNEY BATTON, <br><br> Respondents, <br><br> v. <br><br> GRANT COUNTY, WASHINGTON, <br><br> Petitioner, <br><br> JOHN KRIETE, DAN DURAND, JOHN QUERIN and DAN SIMON and JOHN DOE V-X, and each of them, <br><br> Other Parties. | No. 103111-4 <br><br> En Banc <br><br> Filed: <u>March 5, 2026</u> |

GONZÁLEZ, J.—Derek Batton died in the Grant County Jail after ingesting heroin that had been smuggled into that jail by another inmate. His jailers knew drugs were commonly smuggled into that facility and had cause to do a more rigorous search of the person who smuggled in the drugs that killed Batton.

We have long recognized that jailers owe a special common law duty of care to those they guard. *See Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 635, 244 P.3d 924 (2010) (plurality opinion); *Kusah v. McCorkle*, 100 Wash. 318, 325, 170 P. 1023 (1918); *Riggs v. German*, 81 Wash. 128, 131, 142 P. 479 (1914) (citing *McPhee v. U.S. Fid. & Guar. Co.*, 52 Wash. 154, 100 P. 174 (1909)). That common law duty, when breached, may give rise to liability. *Gregoire*, 170 Wn.2d at 644. Under that common law and related statutes, Batton's family brought this wrongful death suit.

The courts' common law authority is exercised alongside our legislature's plenary power to legislate. We must decide whether, given the jailers' common law duty, the county jail may raise two statutory defenses created in the 1986 tort reform act: felony defense and intoxication defense. RCW 4.24.420; RCW 5.40.060. LAWS OF 1986, ch. 305. We conclude that it may. Accordingly, we reverse the Court of Appeals and remand back to that court for further proceedings consistent with this opinion.

## BACKGROUND

In the summer leading up to this case, the Grant County Sheriff's Office was struggling to control the flow of drugs into the county jail. The record suggests inmates routinely smuggled drugs in and regularly evaded searches. The sheriff's office acknowledged the problem and was seeking additional tools to combat it.

Batton had long struggled with addiction. He had periods of recovery and he had relapses. He was taken to the Grant County Jail on outstanding warrants in August 2018.

Meanwhile, Jordan Tebow smuggled heroin into the jail and gave it to Batton. Heroin is a controlled substance and possession of a controlled substance in a county jail is a felony. RCW 9.94.041(2). Batton used that heroin and died of an overdose. Tebow had previously been charged with bringing drugs into the jail but was not rigorously searched. Tebow has since pleaded guilty to homicide by delivery of a controlled substance under RCW 69.50.415.

Batton's estate (Estate) sued Grant County (or County), primarily alleging the County was negligent in failing to adequately search and prevent Tebow from smuggling the heroin that killed Batton into the jail.

Grant County moved for summary judgment dismissal based on the felony defense statute, RCW 4.24.420, and partial summary judgment on the intoxication defense statute, RCW 5.40.060. The trial court denied summary judgment and certified the case for review.

The Court of Appeals accepted certification on three questions: "(1) whether RCW 4.24.420 applies to the facts of this case, (2) if RCW 4.24.420 is applicable, whether the 2021 statutory amendments apply, and (3) whether the law, as enunciated in the Supreme Court's holding in *Gregoire* . . ., precludes application

of RCW 5.40.060." *Anderson v. Grant County* 28 Wn. App. 2d 796, 802-03, 539

P.3d 40 (2023).  Reaching only the third question,[1] the Court of Appeals affirmed.

*Id.* at 803.  We granted review.  3 Wn.3d 1018 (2024).

ANALYSIS

Given the procedural posture of this case, our review is limited to deciding

whether the common law precludes Grant County from asserting the statutory

felony defense and the intoxication defense. RCW 4.24.420; RCW 5.40.060.

Our "'fundamental objective' when interpreting a statute 'is to discern and

implement the intent of the legislature.'" *Est. of Bunch v. McGraw Residential*

*Ctr.*, 174 Wn.2d 425, 432, 275 P.3d 1119 (2012) (internal quotation marks

omitted) (quoting *Flight Options, LLC v. Dep't of Revenue*, 172 Wn.2d 487, 500,

259 P.3d 234 (2011)).  We start, and often end, by reading the words enacted by

the legislature to determine that intent. *See id.* (quoting *Flight Options, LLC*, 172

Wn.2d at 500).  RCW 4.24.420, known as the statutory felony defense, currently

provides:

> (1) Except in an action arising out of law enforcement activities resulting in
> personal injury or death, it is a complete defense to any action for damages
> for personal injury or wrongful death that the person injured or killed was
> engaged in the commission of a felony at the time of the occurrence causing
> the injury or death and the felony was a proximate cause of the injury or
> death.

---

[1] The Court of Appeals expanded the scope of review for this third question to also address
whether *Gregoire* precluded application of RCW 4.24.420. *Anderson*, 28 Wn. App. 2d at 803-
05.

(2) In an action arising out of law enforcement activities resulting in personal injury or death, it is a complete defense to the action that the finder of fact has determined beyond a reasonable doubt that the person injured or killed was engaged in the commission of a felony at the time of the occurrence causing the injury or death, the commission of which was a proximate cause of the injury or death.

(3) Nothing in this section shall affect a right of action under 42 U.S.C. Sec. 1983.

The County moved for summary judgment dismissal based on this statute.[2]

RCW 5.40.060(1), known as the intoxication defense, provides:

[I]t is a complete defense to an action for damages for personal injury or wrongful death that the person injured or killed was under the influence of intoxicating liquor or any drug at the time of the occurrence causing the injury or death and that such condition was a proximate cause of the injury or death and the trier of fact finds such person to have been more than fifty percent at fault. The standard for determining whether a person was under the influence of intoxicating liquor or drugs shall be the same standard established for criminal convictions under RCW 46.61.502, and evidence that a person was under the influence of intoxicating liquor or drugs under the standard established by RCW 46.61.502 shall be conclusive proof that such person was under the influence of intoxicating liquor or drugs.

The County acknowledges that under this statute, whether Batton was more than 50 percent at fault would be a question for the jury.[3]

---

[2] Given our disposition, the Court of Appeals will need to resolve on remand whether the current version or early version of the statute applies and whether "occurrence causing the injury or death" was the County's alleged negligence in allowing Tebow to bring the heroin into the jail or Batton's possession of the heroin.

[3] "Fault" is defined broadly in our tort law to "include acts or omissions . . . that are in any measure negligent or reckless" (among other things not relevant to this case). RCW 4.22.015.

Our Court of Appeals concluded that this state's common law precludes the County from raising either defense. *Anderson*, 28 Wn. App. 2d at 808-09. The common law recognizes that jailers have the duty to keep incarcerated people "in health and free from harm." *Kusah*, 100 Wash. at 325. This duty stems from the sheriff's obligation "to protect a prisoner while in his custody." *Riggs*, 81 Wash. at 131 (citing *McPhee*, 52 Wash. 154); *see also McPhee*, 52 Wash. at 157 ("a duty to his prisoner to keep him in health and free from harm."). As a matter of tort law, jailers and incarcerated people have a special relationship, which imposes on the jailer "the duty to ensure health, welfare, and safety." *Gregoire*, 170 Wn.2d at 635; *see also* RESTATEMENT (SECOND) OF TORTS § 314A(4) (A.L.I. 1965); *Shea v. City of Spokane*, 17 Wn. App. 236, 242, 562 P.2d 264 (1977).

The special relationship between jailers and incarcerated people arises from the custodial nature of incarceration. *See In re Pers. Restraint of Williams*, 198 Wn.2d 342, 359, 496 P.3d 289 (2021) (citing *Turner v. Dep't of Soc. & Health Servs.*, 198 Wn.2d 273, 286-87, 493 P.3d 117 (2021)). This duty is affirmative and nondelegable. *Gregoire*, 170 Wn.2d at 635, 639; *see also Williams*, 198 Wn.2d at 359 (citing *Gregoire*, 170 Wn.2d at 635 (citing *Shea*, 17 Wn. App at 242)). Nothing in these two statutory affirmative defenses eliminates the jailer's common law duty toward those incarcerated in their jails. That duty remains.

Gregoire concerned a wrongful death suit initiated after a man died by suicide in jail. The jury found that the county was negligent, but that negligence was not a proximate cause of the death. 170 Wn.2d at 634. Over the plaintiff's objection, the jury had been instructed on both assumption of the risk and contributory negligence. *Id.* at 633. Justice Sanders's lead opinion held that allowing a jail "to invoke assumption of risk" as a defense that would bar recovery in an estate's negligence suit would "effectively eviscerate[] the city's duty to protect inmates in its custody. The jail cannot cast off the very duty with which it is charged through a violation of that duty." *Id.* at 638. Chief Justice Madsen's concurrence agreed with the lead opinion on assumption of the risk but held that the jail's duty to protect incarcerated people does not preclude asserting comparative negligence in instances of jail suicide. *Id.* at 645 (Madsen, C.J., concurring/dissenting). Chief Justice Madsen relied in part on comparative fault statutes, which require a jury to apportion fault between parties. *Id.* at 652 (citing RCW 4.22.005, .070).

Five justices agreed with Chief Justice Madsen's comparative negligence analysis, making it the majority opinion on that point of law. *See id.* at 655 n.17 (Alexander, J., dissenting); *In re Det. of Reyes*, 184 Wn.2d 340, 346, 358 P.3d 394 (2015) (citing *Saleemi v. Doctor's Assocs.*, 176 Wn.2d 368, 385-86, 292 P.3d 108 (2013)).

We revisited *Gregoire* briefly in *Hendrickson v. Moses Lake School District*, 192 Wn.2d 269, 428 P.3d 1197 (2018). *Hendrickson* involved an accident in a high school shop class that resulted in a student losing part of her thumb. 192 Wn.2d at 272. As in *Gregoire*, neither of the statutory defenses before us today were implicated. *Id.* at 284-86. In passing, the court characterized *Gregoire* as holding "that a prison may not assert a defense of contributory negligence in situations of inmate suicide," overlooking Chief Justice Madsen's controlling opinion on that subject. *Compare id.*, *with Gregoire*, 170 Wn.2d at 645-49 (Madsen, C.J., concurring/dissenting), 655 n.17 (Alexander, J., dissenting). *Hendrickson*'s mischaracterization of *Gregoire* is not a holding.

The Estate argues that *Gregoire*'s restriction on assumption of the risk defenses encompasses the statutory defenses asserted by Grant County and that *Hendrickson* "adopted Justice Sanders' lead opinion in identifying jail self-injury cases as one of the few examples of where contributory negligence is inappropriate." Suppl. Br. of Resp't at 10. In the Estate's view, *Gregoire* controls whether the jail can assert the felony defense statute because the defense is predicated on assumption of the risk. *Id.* at 14. Essentially, the Estate argues that as a matter of public policy, jails should not be allowed to assert these defenses. *See id.* at 14-17. "If the felony defense is allowed, a jail will never be liable for a drug overdose, no matter how egregious the jail's conduct. This de facto

8

immunization from liability will nullify the jail's duty to take reasonable steps to prevent the flow of drugs into the facility." *Id.* at 16. The Estate attacks the applicability of the intoxication defense on similar grounds. *Id.* at 17.[4]

The County disagrees with the Court of Appeals' interpretation of *Gregoire* and *Hendrickson*. Suppl. Br. of Pet'r at 2, 4-10. In particular, it argues that the felony defense "is not predicated on the assumption of risk, but on the commission of a felony that is a proximate cause of injury or death." *Id.* at 13. On the issue of the intoxication defense, the County disagrees with the Court of Appeals' assessment that in light of *Gregoire*, the difference between the applicability of common law defenses and statutory defenses is negligible. *Id.* at 18-20. Fundamentally, the County's position is that *Gregoire* did not obviate statutory law that was not implicated in the case. The County also argues that the Court of Appeals' decision violates separation of powers because it overrides legislative policy choices. *Id.* at 26-27.

Properly understood, *Gregoire* and *Hendrickson* establish that it is inappropriate to instruct a jury to decide whether an incarcerated individual who died by suicide assumed the risk given the jailer's special duty to the people in the jailer's care, but that the jury may be instructed on comparative fault.

---

[4] These statutory affirmative defenses are separate defenses to liability that must be raised and proved by the defendant.

In 1986, the legislature enacted the tort reform act, which aimed to "create a more equitable distribution of the cost and risk of injury and increase the availability and affordability of insurance." LAWS OF 1986, ch. 305, § 100; *Tegman v. Accident & Med. Investigations, Inc.*, 150 Wn.2d 102, 108, 75 P.3d 497 (2003). The 1986 enactment included versions of the intoxication and felony defenses at issue in this case. LAWS OF 1986, ch. 305, §§ 902, 501; *see also* LAWS OF 1987, ch. 212, §§ 1001, 901. The applicability of these statutory defenses was not restricted or qualified in any manner, even where a special relationship existed. On the contrary, the preamble to the act suggests that these defenses were intended to shield counties from tort liability whenever they are applicable. *See* LAWS OF 1986, ch. 305, § 100 ("The legislature finds that counties, cities, and other governmental entities are faced with increased exposure to lawsuits and awards and dramatic increases in the cost of insurance coverage. . . . In order to improve the availability and affordability of quality governmental services, comprehensive reform is necessary."). As a matter of policy, the legislature intended these defenses to apply whenever any defendant, including counties, faces tort liability. For us to say that these defenses do not apply in the context of jail and prison overdoses would override the clear language of the statutes and require us to replace the legislature's policy determination with our own.

The Estate also suggests that the court may refuse to "allow statutory defenses based on public policy" under *Christensen v. Royal School District No. 160*, 156 Wn.2d 62, 70, 124 P.3d 283 (2005). Suppl. Br. of Resp't at 18. We disagree with that reading of *Christensen*. The court was addressing a narrow certified question—whether a 13 year old who was sexually abused by her teacher could have contributory fault assessed against her under the Washington tort reform act. *Christensen*, 156 Wn.2d at 64. That act had generally required juries to determine each party's fault when rendering a tort judgment and to adjust the plaintiff's damages proportionately. RCW 4.22.005. Nothing in the act specifically addressed whether children could be held at fault generally, let alone for their own sexual abuse. *See* ch. 4.22 RCW.

Based on long-standing precedent, the court looked to criminal statutes, the common law, and public policy to determine whether children could be held to be at fault for their own abuse. *Christensen*, 156 Wn.2d at 67-68. We noted that under that long-standing precedent, whether a legal duty exists "'depends on mixed considerations of logic, common sense, justice, policy, and precedent.'" *Id.* at 67 (internal quotation marks omitted) (quoting *Snyder v. Med. Serv. Corp.*, 145 Wn.2d 233, 243, 35 P.3d 1158 (2001)). The court used the term "policy" several times in making that duty determination, but that was in the context of centuries of common

11

law and statutory silence, not in the context of affirmative statutory defenses that are plainly applicable.

We respectfully disagree with our dissenting colleagues that the general interpretative principle that statutes in derogation of the common law are strictly construed demands a different result. "'[D]erogation' is '[t]he partial repeal or abrogation of a law by a later act that limits its scope or impairs its utility and force.'" *Potter v. Wash. State Patrol*, 165 Wn.2d 67, 77 n.8, 196 P.3d 691 (2008) (alternations in original) (quoting BLACK'S LAW DICTIONARY 476 (8th ed. 2004)). A statute abrogates the common law when it is "'so inconsistent with and repugnant to the prior common law that both cannot simultaneously be in force.'" *Id*. at 77 (quoting *State ex rel. Madden v. Pub. Util. Dist. No. 1*, 83 Wn.2d 219, 222, 517 P.2d 585 (1973)). When a statute derogates the common law, it is strictly construed. *Id*. But "[n]either a liberal construction nor a strict construction may be employed to defeat the intent of the legislature, as discerned through traditional processes of statutory interpretation." *Bunch*, 174 Wn.2d at 432 (citing *Armijo v. Wesselius*, 73 Wn.2d 716, 720, 440 P.2d 471 (1968)). "Strict construction is simply a requirement that, where two interpretations are equally consistent with legislative intent, the court opts for the narrower interpretation of the statute." *Id.* at 432-33.

Nothing in these two statutory affirmative defenses eliminates the jailer's common law duty toward those incarcerated in their jails. That duty remains. These statutory affirmative defenses are separate bars to liability that must be raised and proved by the defendant. They do not eliminate the jailer's special duty. If instead of heroin the jail had allowed Jordan Tebow to smuggle in a gun that Tebow used to shoot Batton, neither of these defenses would be relevant. Both the duty and the defenses can exist simultaneously. Accordingly, these statutes are not in derogation of the common law. We must interpret them based on what they say, not on what they do not.

Even if the statutes were not clear on their face, the legislature made its relevant purpose quite clear in its enacted findings: to reduce the escalating costs of lawsuits on counties, cities, and other governmental entities and "to reduce costs associated with the tort system, while assuring that adequate and appropriate compensation for persons injured through the fault of others is available." LAWS OF 1986, ch. 305, § 100.

These statutes are clear and are consistent with that legislative purpose. The first statute creates a complete defense if the plaintiff was committing a felony that was a proximate cause of their injury. The second creates a complete defense if the plaintiff was intoxicated, that intoxication was a proximate cause, and the plaintiff was at least 50 percent at fault. "Fault" is defined broadly in our tort law

to include "acts or omissions . . . that are in any measure negligent or reckless" (among other things not relevant to this case). RCW 4.22.015. Even under the narrowest construction of these statutes, a breach of a special duty of care does not render the complete defenses unavailable.[5]

While the policy implications of this case are grave, they are not ours to decide. That work falls on the legislature. If the people of Washington, through their elected legislators, conclude that jails should not enjoy such broad immunity in overdose cases, then the statutes can be amended or repealed. But unless and until that happens, courts must apply the law as written—not as we may prefer it to be.

*Gregoire* and the special relationship doctrine do not bar the jail from asserting the statutory defenses established by the legislature in RCW 4.24.420 and RCW 5.40.060.

CONCLUSION

We hold that Grant County is not precluded from raising the statutory felony bar and intoxication defenses. We reverse the decision of the Court of Appeals and remand to that court for further proceedings consistent with this opinion.

---

[5] This is not a case in which an entity assumes an injured party's duty of self-care. *See Hunt v. King County*, 4 Wn. App. 14, 22, 481 P.2d 593 (1971) ("the question of whether the injured party's conduct is a proximate cause becomes irrelevant" given that the hospital assumed the duty of self-care); *see also Gregoire*, 170 Wn.2d at 648 (Madsen, C.J., concurring/dissenting).

_____
Gonzàlez, J.

WE CONCUR:

_____
Stephens, C.J.

_____
Montoya-Lewis, J.

_____

_____

_____
Madsen, J.

_____
Gordon McCloud, J.

_____
Yu, J.P.T.

*Anderson v. Grant County*

No. 103111-4

MUNGIA, J. (dissenting)—The government "cannot cast off the very duty with which it is charged through a violation of that duty." *Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 638, 244 P.3d 924 (2010) (plurality opinion). Grant County (or County) violated its duty to take reasonable steps to prevent the introduction of illegal drugs into its jail. That violation was the proximate cause of Derek Batton's death. By the majority's reasoning, Grant County will be able to use two statutes that may completely bar Mr. Batton's parents from holding the County accountable for its negligence. In short, the majority is allowing Grant County to cast off the very duty with which it is charged through a violation of that duty.

I agree with the majority that the legislature has the ultimate authority to set policy regarding tort liability. However, under our precedent, if the legislature intends to derogate a common law right it must do so clearly and explicitly. This is especially true when the right is based on the government's heightened duty of care. Here, there is no indication that the legislature intended RCW 4.24.420 or RCW 5.40.060 to diminish the common law heightened duty the government owes to those it incarcerates.

In addition, the legislature amended both the statutory defenses to incorporate the concept of proximate cause, the parameters of which are for this court to define. I would hold, based on our precedent, that Mr. Batton's actions are not a legal cause of his death for the purpose of these statutory defenses.

The legislature has not clearly and explicitly demonstrated its intent to allow RCW 4.24.420 and RCW 5.40.060 to completely bar recovery where the government's breach of duty caused the harm to the claimant. Those two statutes should not be available to Grant County to raise as defenses in this action.

I respectfully dissent.

## I
## GRANT COUNTY OWED A SPECIAL DUTY TO MR. BATTON TO TAKE REASONABLE STEPS TO PREVENT THE INTRODUCTION OF ILLEGAL DRUGS INTO ITS JAIL

The government not only owes the duty to exercise reasonable care to protect the people it incarcerates from foreseeable harm but, indeed, has a "special" or "heightened" duty of care. *In re Pers. Restraint of Williams*, 198 Wn.2d 342, 359-60, 496 P.3d 289 (2021); *Kusah v. McCorkle*, 100 Wash. 318, 325, 170 P. 1023 (1918); *Shea v. City of Spokane*, 17 Wn. App. 236, 242, 562 P.2d 264 (1977). We must address the nature of the government's common law duty to people it incarcerates to determine whether the legislature intentionally derogated that duty.

The government's heightened duty stems from the special relationship between the government and the vulnerable people it incarcerates. More than half of people

incarcerated in our jails and prisons wrestle with drug dependency or abuse.[1] A large portion of the jail population has mental health problems.[2] Many in jails are decompensating. They are without any sort of support network. They are cut off from family and friends. All these factors create an environment where many of those incarcerated are extremely vulnerable to taking illegal drugs, if offered. Incarcerated people are not free to get up and leave. It is because of these conditions that the government has a heightened duty to take reasonable steps to safeguard the people it imprisons from known, or knowable, harms. *Binschus v. Dep't of Corr.*, 186 Wn.2d 573, 578, 380 P.3d 468 (2016); *see also Turner v. Dep't of Soc. & Health Servs.*, 198 Wn.2d 273, 286-87, 493 P.3d 117 (2021); *H.B.H. v. State*, 192 Wn.2d 154, 176-77, 429 P.3d 484 (2018).

Over 100 years ago, in *Kusah*, we held that a jail has the duty to take reasonable steps to protect the health and safety of those it incarcerates. 100 Wash. at 325. We held an incarcerated person has the common law right to bring an action for negligence against the government when the government, breaching its duty to protect, proximately causes their injury. *Id.*

---

[1] JENNIFER BRONSON ET AL., BUREAU OF JUST. STAT., U.S. DEP'T OF JUST., DRUG USE, DEPENDENCE, AND ABUSE AMONG STATE PRISONERS AND JAIL INMATES, 2007-2009, at 1 (rev. Aug. 10, 2020), https://bjs/ojp/gov/content/pub/pdf/dudaspji0709.pdf [https://perma.cc/AY97-2B4B].

[2] A U.S. Department of Justice special report found that 64 percent of people incarcerated in jails had a mental health problem, either previously diagnosed or currently presenting. JENNIFER BRONSON & MARCUS BERZOFSKY, BUREAU OF JUST. STAT., U.S. DEP'T OF JUST., INDICATORS OF MENTAL HEALTH PROBLEMS REPORTED BY PRISONERS AND JAIL INMATES, 2011-12, at 3 (June 2017), https://bjs.ojp.gov/content/pub/pdf/imhprpji1112.pdf [https://perma.cc/US6S-ZH7Y].

In that case, Fred Kusah was incarcerated in the Thurston County jail with another person, Ernest Reisch. Mr. Reisch had not been searched for weapons before his confinement. Mr. Reisch had "the charge of insanity lodged against him."[3] *Id.* at 319. Mr. Reisch was placed in the same cell as Mr. Kusah and attacked and injured Mr. Kusah using a knife he smuggled into the jail. Mr. Kusah brought an action against the Thurston County sheriff and against Mr. Reisch. *Id.* at 320. The jury found that the sheriff was negligent.

We noted that the sheriff had a duty to keep those who are incarcerated safe. This duty includes taking reasonable action to prevent harm by the actions of others.

> Whether due and ordinary care was exercised in searching or omitting to search the insane suspect at the time and in the manner and under the circumstances in which he was brought to the custody of the sheriff and his deputy was a question of fact for the jury, to be determined in the light of all the facts and circumstances.

*Id*. at 325.

We accordingly held:

> In the case of the sheriff, both by statute and at common law, as we have seen, he owes the direct duty to a prisoner in his custody to keep him in health and free from harm, and for any breach of such duty resulting in injury he is liable to the prisoner or, if he be dead, to those entitled to recover for his wrongful death.

*Id*.

---

[3] I take this opportunity to disavow the term "insanity," which is stigmatizing to people who experience mental health challenges. I quote it only to illustrate that the jail was on notice about Mr. Reich's mental health problems at the time it booked him into the jail.

We made it clear that the duty to prevent weapons being smuggled into the jail was solely on the sheriff and that the person incarcerated had no such duty.

> [Kusah] certainly was not chargeable with knowledge of any negligence of the sheriff and his deputy in omitting to search and in confining Reisch in the common room of the jail with him for both he and Reisch were in the sole power of the sheriff and his deputy. It would certainly be an inhuman rule that would require any care and caution on the part of an inmate of a jail as to the performance or nonperformance of the duty of his keepers toward him.

*Id.* at 326.

Here, the County acknowledges that its heightened duty includes taking reasonable steps to prevent the flow of drugs into jail.[4] Grant County was well aware it was facing the dire situation of people smuggling drugs into its jail. In a letter written just one month before Mr. Batton's death, Grant County Lieutenant Dan Durand described how commonplace it was to have drugs smuggled into the Grant County Jail and the danger that the illegal drugs posed to those the County incarcerated.

> As you are well aware, the problem of drugs and contraband entering the jail is a present and ongoing concern. Recent intelligence has provided information that drugs and contraband are being brought into the jail even more frequently than first suspected. The inmate who provided the information indicated that it was becoming commonplace for high level gang members to regularly instruct others on the outside to turn themselves in with drugs and contraband inserted rectally or swallowed for excretion later. . . .
>
> . . . .

---

[4] Suppl. Br. of Pet'r at 15; Wash. Sup. Ct. oral arg., *Anderson v. Grant County*, No. 103111-4 (Feb. 13, 2025), at 7 min., 09 sec. to 7 min., 16 sec., *video recording by TVW*, Washington State's Public Affairs Network, http://www.tvw.org.

> In early May, inmates in one dorm were charged for methamphetamine and marijuana possession. A second dorm resulted in two hospital transports, one for overdose of suspected methamphetamine and to remove drugs hidden rectally. . . .
>
> . . . .
>
> Occurring on the same day as the male inmate hospital transports described above, a female inmate was found unconscious with no discernable pulse.

Clerk's Papers (CP) at 113-14.

The drug problem in the jail posed a heightened risk to Mr. Batton. He had a history of drug addiction, recovery, and relapse, and was susceptible to taking drugs if offered to him in jail. Grant County owed Mr. Batton a heightened duty of care to protect his health and safety by taking reasonable steps to prevent the introduction of illegal drugs into its jail.

## II
### BEFORE A COURT CONCLUDES THAT A STATUTE DEROGATES A COMMON LAW CAUSE OF ACTION, IT MUST FIND THAT THE LEGISLATURE CLEARLY AND EXPLICITLY DEMONSTRATED AN INTENT TO DO SO

Under our precedent, we will not conclude that the legislature intended to derogate a common law cause of action unless the statute clearly and explicitly demonstrates such an intent.

> [W]e are hesitant to recognize an abrogation or derogation from the common law absent clear evidence of the legislature's intent to deviate from the common law. "It is a well-established principle of statutory construction that '[t]he common law . . . ought not to be deemed repealed, unless the language of a statute be clear and explicit for this purpose.'"

*Potter v. Wash. State Patrol*, 165 Wn.2d 67, 76-77, 196 P.3d 691 (2008) (second and third alterations in original) (quoting *Norfolk Redevelopment & Hous. Auth. v.*

6

*Chesapeake & Potomac Tel. Co. of Va.*, 464 U.S. 30, 35-36, 104 S. Ct. 304, 78 L. Ed. 2d

29 (1983) (quoting *Fairfax's Devisee v. Hunter's Lessee*, 11 U.S. (7 Cranch) 603, 623, 3

L. Ed. 453 (1813)).[5]

When determining whether the legislature intended to change the common law, we

will strictly construe the statutes at issue.

> Any statute in derogation of the common law "must be strictly construed,"
> and we will not find the legislature intended that the common law be
> changed unless such an intent "appears with clarity."

*State v. Farnworth*, 192 Wn.2d 468, 474, 430 P.3d 1127 (2018) (quoting *McNeal v.*

*Allen*, 95 Wn.2d 265, 269, 621 P.2d 1285 (1980)).

For example, in *Potter*, we were faced with deciding whether the legislature

intended to derogate the common law right to a conversion cause of action when it

enacted a statute that provided procedures for recovering an impounded vehicle.

There, we began our analysis by noting that under the common law, a person has

the right to bring an action for conversion when their vehicle has been unlawfully

impounded. *Potter*, 165 Wn.2d at 78. The State argued that when the legislature enacted

the redemption statute, it eliminated the right to recover under a conversion cause of

action. We accordingly had to determine whether "the legislature clearly expressed its

---

[5] As we explained in *Potter*, "abrogation" is abolishing, annulling, or repealing a law, while "derogation" is the "partial repeal or abrogation of a law by a later act that limits its scope or impairs its utility and force." 165 Wn.2d at 77 n.8 (quoting Black's Law Dictionary 7, 476 (8th ed. 2004)). The same interpretive rules apply to abrogation and derogation, but derogation is at issue here. A statute may derogate the common law even if the common law would still have effect in some alternative circumstances.

intent to abrogate the common law" when it enacted the redemption procedures in RCW

46.55.120. *Id.* at 79. Contrary to the State's argument, we held the vehicle owner could

bring a conversion action because the legislature did not clearly express its intent to make

the redemption procedures the exclusive remedy for unlawful impoundments. *Id*.

The court's first step was to examine the language of the redemption statute. We

found that there was nothing in the language or provisions that made it the exclusive

remedy when a vehicle had been improperly impounded. *Id*. at 80. Because the language

was inconclusive, and the statute did not contain an exclusivity provision, we then

examined the other manifestations of the legislature's intent. *Id*. at 84.

We read the language of the statute narrowly in discerning legislative intent. We

noted that the statute specified that vehicle redemption could occur "'only under the

following circumstances.'" *Id*. at 81 (quoting former RCW 46.55.120(1) (2004)).

Although that language could be read broadly to derogate the common law, we

interpreted the phrase narrowly. We held that the legislature intended the statute to apply

only to vehicle redemptions and held that it did not affect the cause of action for

conversion. *Id.* at 81-82.

We then narrowly read the portion of the statute that conferred jurisdiction on

municipal and district courts "to determine 'issues involving all impoundments.'" *Id*. at

82-83 (quoting RCW 46.55.120(2)(b)). While this phrase could have been construed to

mean that the legislature intended only municipal and district courts to have jurisdiction

to determine the lawfulness of an impoundment, we elected not to give it such a broad

8

construction. *Id.* at 83. Instead, we narrowly construed the phrase and concluded that the legislature did not intend to strip superior courts of their jurisdiction to hear other claims such as conversion claims. *Id.*

We then examined the statutory language that said an owner waives their right to challenge the impoundment if they waive their right to a hearing under the impoundment statute. *Id.* at 83-84. We construed that language narrowly and held that an owner does not lose their right to have a hearing on a conversion action just because they lose their right to a hearing in the statutory redemption action. *Id.* at 84.

In short, we followed our precedent and narrowly construed the terms of a statute that could have been read to derogate a right under the common law. We must follow our precedent and do the same here.

## III
### THE LEGISLATURE DID NOT CLEARLY AND EXPLICITLY EXPRESS AN INTENT TO DEROGATE THE COMMON LAW DUTY TO PROTECT

To determine the legislature's intent, a court begins its analysis by examining the plain meaning of the statute.

First, the felony defense statute provides:

(1) Except in an action arising out of law enforcement activities resulting in personal injury or death, it is a complete defense to any action for damages for personal injury or wrongful death that the person injured or killed was engaged in the commission of a felony at the time of the occurrence causing the injury or death and the felony was a proximate cause of the injury or death.

(2) In an action arising out of law enforcement activities resulting in personal injury or death, it is a complete defense to the action that the finder of fact has determined beyond a reasonable doubt that the person

9

injured or killed was engaged in the commission of a felony at the time of the occurrence causing the injury or death, the commission of which was a proximate cause of the injury or death.

(3) Nothing in this section shall affect a right of action under 42 U.S.C. Sec. 1983.

RCW 4.24.420.

The second statute, the intoxication defense, provides:

[I]t is a complete defense to an action for damages for personal injury or wrongful death that the person injured or killed was under the influence of intoxicating liquor or any drug at the time of the occurrence causing the injury or death and that such condition was a proximate cause of the injury or death and the trier of fact finds such person to have been more than fifty percent at fault.

RCW 5.40.060(1).

Like in *Potter*, the language of the statutes is inconclusive. The statutes do not acknowledge the common law heightened duty to protect that they would derogate if they were to be applied in this context. Therefore, I next look to evidence of legislative intent and construe that language as narrowly as reasonably possible to avoid derogating the common law. Based on this narrow reading, the legislature did not intend to derogate the common law when it enacted the defenses in RCW 4.24.420 and RCW 5.40.060(1).

IV
THE LEGISLATURE'S AMENDMENTS TO THE TWO STATUTORY DEFENSES ALSO SUPPORT A NARROW CONSTRUCTION

In addition to the text of the two statutory defenses, we may also consider related statutes, amendments to the statutes, and the statutory scheme to determine their

meaning. *Ass'n of Wash. Spirits & Wine Distribs. v. Wash. State Liquor Control Bd.*, 182 Wn.2d 342, 350, 340 P.3d 849 (2015).

The amendments to the two statutes show the legislature intended them to be construed narrowly. After originally enacting the two statutory defenses in 1986, the legislature directed the office of the insurance commissioner to review and evaluate the recent changes to our tort system. LAWS OF 1986, ch. 305, § 909. The commissioner convened a committee that made recommendations to the legislature. *See* TORT REFORM COMM., REPORT TO THE INSURANCE COMMISSIONER OF THE STATE OF WASHINGTON ON THE 1986 TORT REFORM ACT (Jan. 1987). The committee raised concerns about the breadth of the two statutory defenses and unintended results that would occur if they were not amended.

> The Committee has concluded that as drafted Section 501 [felony defense] would have results so drastic that it is unlikely those results were intended by the legislature.

*Id.* at 51.

Regarding the intoxication defense statute, the committee noted that the statute failed to include the concept of proximate cause and urged the legislature to include that limitation.

> The Committee concluded that this statute fails to include the concept of proximate cause in the analysis of the claims which might be made by an intoxicated person. Proximate cause should be considered, in order to avoid situations where there is a legally insufficient nexus between the intoxicated condition and the injury. Intoxication may actually be irrelevant. The Committee also felt it appropriate to tie the issue of proximate cause to the event causing injury rather than to the injury itself.

   This would avoid disputes in cases where the intoxication hinders recovery,
   but did not contribute to the accident.

*Id*. at 70.

  In 1987, the legislature added the limitation of proximate cause to the two statutory defenses. For the felony defense statute, the legislature replaced the broad language "if the felony was causally related to the injury or death in time, place, or activity" with language that restricted the defense. Former RCW 4.24.420 (1986). The amendment provides that the defense is available where the person was engaged in the commission of a felony "at the time of the occurrence causing the injury or death" and the felony was "a proximate cause of the injury or death." LAWS OF 1987, ch. 212, § 901.[6] For the intoxication defense statute, the legislature revised the language in a similar fashion. The legislature required that the person injured or killed be under the influence of intoxicating liquor or any drug "at the time of the occurrence causing the injury or death" and that the person's condition be a "proximate cause of the injury or death." LAWS OF 1987, ch. 212, § 1001.

  There is no clear and explicit demonstration that the legislature intended to derogate the common law cause of action against the government when its actions were the proximate cause of the harm to the incarcerated person. In fact, the amendments to the two statutes at issue demonstrate just the opposite: the legislature intended the scope of those two statutes to be narrowly construed.

---

[6] The parties disagree on the meaning of the term "occurrence," which remains an open question in this case on remand.

12

V

NARROWLY CONSTRUING THE TWO STATUTES AT ISSUE, THE LEGISLATURE DID NOT
MANIFEST AN INTENT FOR THESE STATUTES TO COMPLETELY BAR RECOVERY WHEN
THE GOVERNMENT'S ACTIONS PROXIMATELY CAUSED THE INJURIES

Because the legislature incorporated the common law concept of proximate cause in both statutes, it preserved a policy role for the courts. The key phrase for this court to construe narrowly, which is found in both statutes, is "proximate cause of the injury or death." RCW 4.24.420(1); RCW 5.40.060(1).

"Proximate cause" is not defined in the statutes. However, when the legislature uses a term that is well known at common law, we presume that the legislature intended that term to have its common law meaning. *Schwartz v. King County*, 200 Wn.2d 231, 239-40, 516 P.3d 360 (2022).

Under the common law, proximate cause requires two elements: (1) factual cause and (2) legal cause. *N.L. v. Bethel Sch. Dist.*, 186 Wn.2d 422, 436-37, 378 P.3d 162 (2016) (citing *Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985)). Whether factual cause exists is generally for the jury to determine. *Id*. at 437. It is a "but-for" test (e.g., "But for" the stop sign missing, the cars would not have collided.).

In contrast, legal cause is a question of law. Legal cause rests on policy considerations regarding how far the consequences of a party's actions should extend. *See Hartley*, 103 Wn.2d at 779. In determining legal causation, courts weigh "'mixed considerations of logic, common sense, justice, policy, and precedent.'" *Id.* (quoting *King v. City of Seattle*, 84 Wn.2d 239, 250, 525 P.2d 228 (1974)). The concept of legal

13

cause, i.e., proximate cause,[7] applies to the plaintiff's actions, as well as the defendant's

actions.[8] As a leading treatise has stated:

> "Proximate cause" . . . is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct. . . . [L]egal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.

W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS §41, at 264 (5th

ed. 1984).

By incorporating the common law term "proximate cause," the legislature

included the legal causation element and, therefore, preserved a policy role for the court.

Thus, this court's inquiry should be whether these defenses are available as a matter of

---

[7] What Washington law terms "legal cause" is referred to as "proximate cause" in *Restatement (Second) of Torts* (A.L.I. 1965). Thus, proximate cause in Washington refers to the entire causation prong of the negligence analysis while in the *Restatement* it refers to just one subpart of the causation prong. Regardless, both definitions of proximate cause incorporate a policy role for the courts.

[8] Section 465 of *Restatement (Second) of Torts* provides:

(1) The plaintiff's negligence is a legally contributing cause of his harm if, but only if, it is a substantial factor in bringing about his harm and there is no rule restricting his responsibility for it.

(2) The rules which determine the causal relation between the plaintiff's negligent conduct and the harm resulting to him are the same as those determining the causal relation between the defendant's negligent conduct and resulting harm to others.

policy under these circumstances. To make this determination, I look to other cases where tort principles turned on public policy considerations.

A. The Proximate Cause Analysis in *Hunt v. King County* Provides Guidance

The analysis and approach taken in *Hunt v. King County*, 4 Wn. App. 14, 481 P.2d 593 (1971), provides guidance. There, Jerome Hunt was hospitalized at Harborview Hospital with a history of substance abuse and mental health issues. *Id.* at 17. He was placed on the mental health ward. *Id.* It was reasonably foreseeable that patients hospitalized in the mental health ward may engage in self-harm. *Id.* at 20. That danger came to pass when Mr. Hunt jumped out of a fifth-story window, injuring himself. *Id.* at 18-19.

Mr. Hunt's father brought an action on his own behalf and on behalf of his son, alleging that Harborview Hospital was negligent when it violated its own policy of ensuring that the door to a utility room was locked at all times so that patients could not enter the room and jump out of the window. *Id.*

Harborview Hospital argued that Mr. Hunt's actions were the proximate cause of his injuries and that he was contributorily negligent as a matter of law. The Court of Appeals noted that Harborview owed their patients the duty to take reasonable steps to protect them against reasonably foreseeable self-inflicted injury. *Id.* at 19-20.

The Court of Appeals held that the operative duty was the duty owed by the hospital. *Id.* at 18-19. The patients did not have the duty to ensure their own safety in

that setting. *Id.* at 22. Because the patients did not have a duty, their conduct could not

be considered a proximate cause of the accident. *Id*. The court stated:

> A duty broad in scope, such as the hospital's duty to safeguard its
> patient under its exclusive control in a closed psychiatric ward, against the
> reasonably foreseeable risk of self-inflicted injuries, is another matter.
> Such a duty contemplates the reasonably foreseeable occurrence of self-
> inflicted injury whether or not the occurrence is the product of the injured
> person's volitional or negligent act. In principle, as between the actor and
> the injured party, the necessary effect of such a duty undertaken or imposed
> during its operative period may be said to absolve the injured party from
> the performance of his otherwise existing duty to take reasonable care to
> avoid self-injury. He is not called upon to perform the duty of the actor.
> The injured party being absolved from the duty of self-care, the question of
> the injured party's conduct, whether or not volitional or whether or not
> otherwise constituting contributory negligence, does not arise. In the
> absence of a duty breached, the question of whether the injured party's
> conduct is a proximate cause becomes irrelevant.

*Id*. (citations omitted).

The Court of Appeals noted that holding patients responsible for their own safety

would allow a defendant hospital to become indifferent to its duty of care for its patients.

*Id.* at 22-23. The court quoted a leading treatise for that very principle:

> "Obviously, the defendant cannot be relieved from liability by the fact that
> the risk, or a substantial and important part of the risk, to which he has
> subjected the plaintiff has indeed come to pass. . . [.] The courts are quite
> generally agreed that the intervening causes which fall fairly in this
> category will not supersede the defendant's responsibility."

*Id.* at 23 (first alteration in original) (quoting WILLIAM L. PROSSER, HANDBOOK OF THE

LAW OF TORTS §51, at 312 (3d ed. 1964). We are bound to adhere to this approach.

Here, the jail owed a heightened duty to safeguard inmates from known harms.

Those inmates, without any choice of cellmate selection or the ability to get up and leave,

do not have a duty to ensure their own safety from the dangers of the jail environment.

Because Mr. Batton did not have a duty, his conduct cannot be considered a proximate

cause of his death for the purpose of these statutory defenses.

B. <u>We Held in *Christensen* That, for Policy Reasons, the Contributory Fault
Statute Did Not Apply</u>

In *Christensen v. Royal School District No. 160*, 156 Wn.2d 62, 124 P.3d 283

(2005), we held that as a matter of public policy, a 13-year-old girl did not have a duty to

prevent a teacher from sexually abusing her.

There, a teacher sexually abused a 13-year-old student. The school district argued

that the statutory defense of contributory negligence found in RCW 4.22.005 applied. *Id.*

at 66-67. In short, the school district claimed that the 13-year-old child could be found

partially at fault for being sexually abused by her teacher. *Id.* at 68. RCW 4.22.005

provided:

> In an action based on fault seeking to recover damages for injury or death
> to person or harm to property, any contributory fault chargeable to the
> claimant diminishes proportionately the amount awarded as compensatory
> damages for an injury attributable to the claimant's contributory fault, but
> does not bar recovery.

The school district was correct that by the plain reading of the statute, the 13-year-

old child could be found to have been contributorily negligent for not protecting herself

from being sexually abused by her teacher. However, we rejected the notion that a child

has a duty to protect herself from sexual abuse. *Id.* at 71-72. We held that the school

district's duty to protect students from being sexually abused by their teachers could not

be diminished by a student's alleged failure to take steps to avoid the sexual abuse. *Id.* at

17

72 n.2. We held that RCW 4.22.005 would violate public policy and thus could not be

applied in this situation. *Id*. at 70. We explained:

> Our conclusion that the defense of contributory negligence should
> not be available to the District and Principal Anderson is in accord with the
> established Washington rule that a school has a "special relationship" with
> the students in its custody and a duty to protect them "from reasonably
> anticipated dangers." *Niece v. Elmview Group Home*, 131 Wn.2d 39, 44,
> 929 P.2d 420 (1997) (citing *McLeod v. Grant County Sch. Dist. No. 128*, 42
> Wn.2d 316, 320, 255 P.2d 360 (1953)). The rationale for imposing this
> duty is on the placement of the student in the care of the school with the
> resulting loss of the student's ability to protect himself or herself. *Niece*,
> 131 Wn.2d at 44. The relationship between a school district and its
> administrators with a child is not a voluntary relationship, as children are
> required by law to attend school. *See McLeod*, 42 Wn.2d at 319.
> Consequently, "the protective custody of teachers is mandatorily
> substituted for that of the parent." *Id.*

*Id.* The same is true here. The relationship between a jail and the people who are

incarcerated within the jail is not a voluntary relationship. Those who are incarcerated in

jails are particularly vulnerable, and susceptible, to accepting illegal drugs if those drugs

are offered to them. That is the very basis for the heightened duty the jailer owes to those

who are incarcerated.

> C. The Lead Opinion's Reasoning in *Gregoire* Leads to the Conclusion That
> These Two Statutes Cannot Provide a Complete Bar to Common Law Causes
> of Action

*Gregoire* supports the conclusion that the two statutory defenses at issue cannot be

applied in this case.

Edward Gregoire was held in the Oak Harbor jail. *Gregoire*, 170 Wn.2d at 631-

32. Mr. Gregoire died by suicide while incarcerated in the jail. *Id.* at 632. Mr.

Gregoire's estate sued Oak Harbor, alleging that it was negligent and that its negligence

18

was a proximate cause of Mr. Gregoire's death. *Id.* at 633. At trial, the court allowed

Oak Harbor to raise the implied primary assumption of risk and contributory negligence

defenses. *Id.* at 634. The jury found Oak Harbor negligent but concluded its negligence

did not proximately cause Mr. Gregoire's death. *Id*. at 643.

This court ordered a new trial, ruling that assumption of the risk could not be

applied where it would provide a complete bar to recovery. *Id.* at 645 (Madsen, C.J.,

concurring/dissenting). Four justices determined that contributory negligence was also

inapplicable. *Id*. at 638 (Sanders, J., lead opinion).

### 1. *Assumption of the Risk*

The court acknowledged the long-recognized heightened duty of care that the

government owes to those it incarcerates. *Id.* at 635. The issue before the court was

whether the defense of assumption of the risk applied. We held, as a matter of policy,

that the defense could not be used in this setting because, if that were allowed, the

government's breach of its duty that caused the harm would have been excused:

> Allowing Oak Harbor to invoke assumption of risk effectively eviscerated
> the city's duty to protect inmates in its custody. The jail cannot cast off the
> very duty with which it is charged through a violation of that duty.

*Id*. at 638.

That same reasoning applies here. The only difference is that this case involves a

statutory defense, while in *Gregoire* the defense was a common law defense. That

difference does not change the analysis. It would change the outcome only if it was clear

and explicit that the legislature intended to derogate the cause of action that arises from

19

the government's breach of its duty. Seven justices agreed with this holding: Justices

Sanders, Charles Johnson, Chambers, Stephens, Owens, James Johnson, and Chief

Justice Madsen.

### 2. *Contributory Negligence*

At trial, the court instructed the jury as to contributory negligence:

> "Contributory negligence is negligence on the part of a person claiming
> injury or damage that is a proximate cause of the injury or damage
> claimed.". . . "Defendant further claims that Mr. Gregoire was
> contributorily negligent and assumed the risk of death when he hanged
> himself, and therefore his own conduct was the sole proximate cause of his
> death."

*Id*. (quoting trial record).

The lead opinion of Justice Sanders engaged in the following analysis. Justices

Charles Johnson, Chambers, and Stephens joined that opinion. While the lead opinion

did not have a majority for its contributory negligence analysis, its reasoning is

persuasive.

Justice Sanders once again noted the heightened duty the government owes to

those it incarcerates, which includes taking steps to protect against self-inflicted harm.

*Id*. at 639. Justice Sanders noted that in *Christensen* we held that the statutory defense of

contributory negligence could not be applied. Justice Sanders wrote that analytically the

same would be true when dealing with the heightened duty owed to a person who dies of

suicide while incarcerated.

> In the case of suicide, a similar principle applies to the jailer-inmate
> relationship, even when the inmate is not a minor. Once a jailer forms a
> special relationship with an inmate, contributory negligence cannot excuse

20

a jailer's duty to protect the inmate, even from self-inflicted harm. To hold otherwise would gut the duty.

*Id*. at 639-40.

Justice Sanders noted that other jurisdictions follow that reasoning: the government cannot assert contributory negligence when it exposes the incarcerated person to the danger that harmed them.

> "'The happening of the very event the likelihood of which makes the actor's conduct negligent and so subjects the actor to liability cannot relieve him from liability. . . . *To deny recovery because the other's exposure to the very risk from which it was the purpose of the duty to protect him resulted in harm to him, would be to deprive the other of all protection and to make the duty a nullity.*'"

*Id*. at 641 (alteration in original) (quoting *Sandborg v. Blue Earth County*, 615 N.W.2d 61, 65 (Minn. 2000) (quoting RESTATEMENT (SECOND) OF TORTS § 449 cmt. b)).

Chief Justice Madsen delivered the majority opinion on contributory negligence. She, joined by five justices, took the view that the doctrine of contributory negligence may apply to those who are incarcerated under certain circumstances.

> [D]epending on the facts, a trial court commits no error when it instructs the jury to apply comparative negligence to instances of jail suicide. A jail has a duty to provide health screenings and health care if necessary, and to protect an inmate from injury by third parties and jail employees, but it has no freestanding duty to prevent inmate self-inflicted harm. That duty arises only when specifically articulated by law or if the jail affirmatively assumes the inmate's duty of self-care. Even if this duty arises, it would not necessarily eliminate the inmate's duty of self-care. In instances where both parties have duties, comparative negligence may apply. Only when the plaintiff can prove that the jail assumed the inmate's duty of self-care does comparative negligence become inappropriate.

21

*Id*. at 645 (Madsen, C.J., concurring/dissenting).  In her concurrence/dissent, Chief

Justice Madsen wrote that the government does not have a duty to protect a person who is

intending to harm themselves.  *Id*. at 647.

Here, Grant County did have the duty to take reasonable steps to prevent the

introduction of illegal drugs into the jail.  Additionally, in this case it is not clear that

Mr. Batton intended to harm himself.  A reasonable jury could find, based on an

understanding of substance use disorder, that Mr. Batton did not intend self-harm but

instead responded to addiction by ingesting heroin, unfortunately resulting in a fatal

overdose.

Moreover, contributory negligence, unlike the statutory defenses at issue here,

does not completely bar actions against the government.  Chief Justice Madsen's holding

that contributory negligence may be available in some circumstances was in part based

on the observation that the doctrine does not "bar recovery, risk an 'all or nothing' result,

or gut the jail's duty." *Gregoire*, 170 Wn.2d at 653-54 (Madsen, C.J.,

concurring/dissenting).  In contrast, a broad reading of the statutory defenses asserted

here results in precisely those harms.

In this case, the application of the felony defense statute completely bars the cause

of action, and the intoxication defense statute could potentially completely bar the cause

of action.  There is no clear and explicit legislative intent justifying that result.

## VI
### CONCLUSION

The majority is correct that the legislature has the authority to set tort policy for this state. However, that begs the question: Did the legislature intend to derogate the government's heightened duty of care to protect the people it incarcerates from the introduction of illegal drugs into its jails?

Our case law is clear: we will not find that a statute derogates a common law duty unless that legislative intent is clearly and explicitly evident. The intent to derogate the common law duty is not explicitly evident here. Indeed, to the contrary, it appears that the legislature amended the statutes at issue to prevent such a draconian result by incorporating the common law concept of proximate cause. At the very least, the legislative intent here is ambiguous. As in baseball where a tie goes to the runner, in this context ambiguity goes to a finding that the legislature did not intend to derogate the common law right.

Additionally supporting this conclusion is long-standing precedent demonstrating that our state's policy weighs strongly against applying the defenses here. Under the court's policy role in interpreting "proximate cause" in the statutory language, I would hold Mr. Batton's actions were not the legal cause of his death.

Because the legislature has not expressed a clear intent to derogate the common law duty that jails owe to the people they incarcerate, RCW 4.24.420 and RCW 5.40.060 are not available to the County in this case.

I respectfully dissent.

Mungia, J.

Johnson, J.

Whitener, J.

24